Lester L. PERKINS, D.V.M., Individually and/or for similarly situated persons and as a class action

v.

Howard SMITH, Clerk, Circuit Court for Montgomery County, et al.

No. 73-222-HM.

United States District Court,
D. Maryland.

Jan. 28, 1974.

Edward L. Genn, Silver Spring, Md., for plaintiff.

Lawrence Ebner, Dept. of Justice, Washington, D. C., Thomas L. Crowe, Asst. U. S. Atty., Baltimore, Md., for defendants United States and Paul R. Schlitz; Harlington Wood, Jr., Asst. Atty. Gen., George Beall, U. S. Atty., Harland F. Leathers, Atty., Dept. of Justice, on brief.

Francis X. Pugh, Asst. Atty. Gen., for defendants State of Maryland, Howard Smith and Jury Commissioner; Francis B. Burch, Atty. Gen., on brief.

Alfred H. Carter, Deputy County Atty., for defendant Montgomery County; Richard S. McKernon, County Atty., Stephen J. Orens, Asst. County Atty., on brief.

Before WINTER, Circuit Judge, and WATKINS and MURRAY, District Judges.

HERBERT F. MURRAY, District Judge.

Plaintiff Lester L. Perkins, a resident alien, successfully asserted before a three-judge panel of this Court that the State of Maryland may not constitutionally bar him from being examined for or licensed as a doctor of veterinary medicine solely because of his alienage.[1] In the present case he has again invoked the jurisdiction of a three-judge court to challenge his exclusion from service in Maryland on grand and petit jury panels in the state and federal courts solely because of his alienage.

As originally brought, plaintiff sought to represent a class—aliens otherwise qualified who were willing to serve as jurors. At the argument, after the difficulties this would present were pointed out, counsel for plaintiff asked leave orally to amend the complaint by striking out the qualification relating to willingness. Leave to amend was granted. There are, however, grave doubts as to whether even as so limited, aliens would constitute a "cognizable group", since its composition would vary from day to day with immigration, emigration and naturalization; as distinguished from the recognized cognizable groups based on sex, religion, color and race.

Laws of the state and nation make clear that jurors must be citizens of the United States.[2] Plaintiff claims the

1. Perkins v. Board of Veterinary Medical Examiners of Maryland, Civil No. 72-1174-HM. Judgment was entered for the plaintiff on March 16, 1973, following an oral opinion in the matter rendered at a hearing held on March 2, 1973.

2. 28 U.S.C. § 1865 provides:
§ 1865. Qualifications for jury service
(a) The chief judge of the district court, or such other district court judge as the plan may provide, on his initiative or upon recommendation of the clerk or jury com-

statutes imposing this citizenship requirement for jurors deny to him and others like him equal protection of the laws comprehended in the guarantees of the Fifth and Fourteenth Amendments to the Constitution of the United States.

Plaintiff urges that it cannot be disputed that aliens are "persons" within the protection of the equal protection clause of the Fourteenth Amendment.[3] He contends that distinctions based on alienage have been held to be invidious, suspect, and subject to close judicial scrutiny.[4] Finally, he submits that no compelling state or federal interest justifies the disqualification of aliens as a class from jury service.

In support of these points, he places principal reliance on Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L. Ed.2d 534 (1971), which held that states could not exclude aliens from welfare benefits. Further, he cites two recent decisions handed down by the Supreme Court since the present suit was filed. Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853, and In Re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910. These cases, both decided on June 25, 1973, held that citizenship could not be made a prerequisite for holding a certain class of civil service employment in the State of New York (*Sugarman*) or for admission to the bar in the State of Connecticut (*Griffiths*).

Defendants make the argument that those cases which have extended constitutional protection to aliens have concerned not political but economic rights. Thus, in a long line of cases since 1915 the courts have considered as invalid state discriminations against aliens

---

mission, shall determine solely on the basis of information provided on the juror qualification form and other competent evidence whether a person is unqualified for, or exempt, or to be excused from jury service. . . .

(b) In making such determination the chief judge of the district court, or such other district court judge as the plan may provide, shall deem any person qualified to serve on grand and petit juries in the district court unless he—

(1) is not a citizen of the United States eighteen years old who has resided for a period of one year within the judicial district;

The Maryland statutes are not so explicit. Article 51, § 1, Annot.Code of Maryland (1972 Replacement Vol.) provides:

§ 1. Declaration of policy.

Whenever a litigant in a court of this State is entitled to trial by jury, he shall have the right to a petit jury selected at random from a fair cross section of the citizens of this State resident in the county wherein the court convenes or in Baltimore City if the court convenes therein. Whenever a person is accused of an indictable criminal offense under the laws of this State, he shall have the right to a grand jury selected at random from a fair cross section of the citizens of this State resident in the county wherein the court convenes or in Baltimore City if the court convenes therein. All citizens of this State (1) shall have the opportunity to be considered for service on grand and petit juries in the courts of this State by maintaining their names on the roll of registered voters for State elections, and (2) shall have an obligation to serve as jurors when summoned for that purpose.

Section 2 of the same Article reads:

§ 2. Discrimination prohibited.

No citizen shall be excluded from service as a grand or petit juror in the courts of this State on account of race, color, religion, sex, national origin, or economic status.

Section 6(b) reads, in relevant part:

. . . the jury judge shall deem any person qualified to serve on grand or petit juries unless he—

(i) Is not constitutionally qualified to vote in this State in the county wherein the court convenes or Baltimore City if the court convenes therein, or;

(ii) Is unable to read, write, or understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form, or;

(iii) Is unable to speak the English language or comprehend spoken English. . . .

It is clear from these sections that Maryland statutes exclude aliens from jury duty.

3. Plaintiff cites, for these propositions, Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948), and Graham, infra.

4. Graham v. Richardson, 403 U.S. 365, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971).

which tended to interfere with the means to a livelihood.[5]

Additionally, defendants contend that whether the test to sustain a restriction of jury service to citizens be "compelling state interest" or "rational basis", the federal and state statutes here involved can be sustained under either standard.[6]

Since the defendants are willing to measure the statutes here against either test, the Court need look only to whether the stricter standard of compelling interest has been satisfied, although, as said in *Sugarman, supra,* 413 U.S. p. 648, 93 S.Ct. p. 2850 (in connection with qualification for office) "our scrutiny will not be so demanding where we deal with matters resting firmly within a State's constitutional prerogatives." . . . in exclusions "from participation in its democratic political institutions."

In Carter v. Jury Commission, 396 U.S. 320, at page 332, 90 S.Ct. 518, at page 525, 24 L.Ed.2d 549 (1970), the Court stated:

The states remain free to confine the selection [of jurors] to citizens . . . .

While this was dictum, it was significant dictum since it represented a construction and limitation of the Court's specific holding. The language was that of a unanimous court of eight. *Graham* was decided one year later by the same eight Justices plus Mr. Justice Black-

mun. No overruling of the *Carter* dictum is expressed or can be inferred.

Various reasons are advanced as upholding alien disqualification from jury service—that it is reasonable to limit such service to those who participate in and manifest an interest in the affairs of citizenship, that aliens as a class will be less qualified than citizens from the standpoint of familiarity with local laws, customs and language to fully understand the actions and motives of litigants, that aliens do not owe sole and permanent allegiance to the United States, and that jury service is a unique responsibility going to the heart of representative government and as such should be entrusted only to citizens.

Do the State of Maryland and the United States have a compelling interest in confining service on grand and petit juries to citizens?

In the view of this Court, both governments have such an interest. That interest in the final analysis is in assuring that those who make the ultimate factual decisions on issues of personal liberty and property rights under our system of justice be either native born or naturalized citizens, because it may fairly be concluded that as a class they are more likely to make informed and just decisions in such matters than are non citizens. Black's Law Dictionary defines an alien as "a person resident, in one country, but owing allegiance to an-

5. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (Arizona anti-alien labor law held unconstitutional); Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948) (California statute prohibiting persons "ineligible for citizenship" from obtaining a commercial fishing license); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (Arizona and Pennsylvania welfare restrictions on aliens held unconstitutional); Miranda v. Nelson, 351 F.Supp. 735 (D. Ariz.1972) (Arizona constitutional and statutory provisions barring employment of aliens in social service and educational positions held invalid); Chapman v. Gerard, 456 F.2d 577 (3rd Cir. 1972) (statute barring aliens from participation in territorial scholarship fund unconstitutional); Sugarman v. Dou-

gall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (denial to alien of certain class of civil service employment in State of New York unconstitutional); In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (Connecticut exclusion of aliens from practice of law unconstitutional); Perkins v. Board, Civil Action 72–1174 (D.Md.1973) (Maryland statute barring alien from being examined for or issued license as doctor of veterinary medicine unconstitutional).

6. Defendants Paul Schlitz and the United States, while contending that the "compelling interest" test has evolved under the Fourteenth Amendment as a limitation on state rather than federal action, maintain that the federal statute "would fully withstand scrutiny" under such a test were it deemed applicable to the federal government.

other. . . . In the United States, one born out of the jurisdiction of the United States, and who has not been naturalized under their constitution and laws." On the other hand, a citizen is "One who, under the constitution and laws of the United States, or of a particular state, and by virtue of birth or naturalization within the jurisdiction, is *a member of the political community,* owing allegiance and being entitled to the enjoyment of full civil rights" (Emphasis supplied).

In *Sugarman, supra,* the Court found the particular New York Civil Service Law under review too broad and imprecise. Although rejecting a flat ban on the employment of aliens in positions with little if any relation to a State's legitimate interest, the Court went on to point out it was not holding that a State may not, in an appropriately defined class of positions, require citizenship as a qualification for office. Such power, the Court said

> "inheres in the State by virtue of its obligation, already noted above, 'to preserve the basic conception of a political community.' Dunn v. Blumstein, 405 U.S. [330], at 344, 92 S.Ct. [995] at 1004, [31 L.Ed.2d 274]. And this power and responsibility of the State applies not only to the qualifications of voters, but also to persons holding state elective or important nonelective executive, legislative, and judicial positions, for officers who participate directly in the formulation, execution, or review of broad public policy perform functions that go to the heart of representative government. There, as Judge Lumbard phrased it in his separate concurrence, is 'where citizenship bears some rational relationship to the special demands of the particular position.' 339 F.Supp [906], at 911."

This Court considers that grand and petit jurors in both state and federal courts are "persons holding . . . important nonelective . . . judicial positions", that they participate directly in the execution of the laws and "perform functions that go to the heart of representative government." Blackstone considered juries as "the best investigators of truth, and the surest guardians of public justice." The institution of jury trial, he said, "preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens." [7] In No. 83 of The Federalist, Alexander Hamilton, after referring to the "high estimation" in which he held the institution of jury trial, concluded that "it would be altogether superfluous to examine to what extent it deserves to be esteemed useful or essential in a representative republic, or how much more merit it may be entitled to as a defense against the oppressions of an hereditary monarch, than as a barrier to the tyranny of popular magistrates in a popular government. Discussions of this kind would be more curious than beneficial, as all are satisfied of the utility of the institution, and of its friendly aspect to liberty." [8]

It is not too much to conclude, therefore, that trial by jury is one of the chief underpinnings in the Anglo-Saxon system of justice, which in turn is one of the principal foundations of this nation. Juries at several levels make very difficult and essentially unreviewed determinations of fact. Grand juries decide which persons must answer to the state for alleged misdoings; petit juries resolve once and for all, and with only minimal supervision, issues of fact on which depend broad issues of law. It is really juries who are the final arbiters of truth and consequently of justice. It is therefore not difficult for this Court to conclude that the jury is one of the institutions at the heart of our system of government.

---

7.  3 Blackstone Commentaries, Sec. 380.

8.  The Federalist No. 83, at 562 (J. Cooke Ed. 1961) (Hamilton).

In maintaining the jury system as "the very palladium of free government" the states logically can anticipate that native-born citizens would be conversant with the social and political institutions of our society, the customs of the locality, the nuances of local tradition and language. Likewise naturalized citizens, who have passed through the citizenship classes sponsored by the Immigration and Naturalization Service, have demonstrated a basic understanding of our form of government, history and traditions. There is no corresponding basis for assuming that resident aliens, who owe allegiance not to any state or to the federal government, but are subjects of a foreign power, have so assimilated our societal and political mores that an equal reliance could be placed on their performing as well as citizens the duties of jurors in our judicial system.

The nature of the operation of juries makes it apparent that persons unfit for jury service can work a great deal of harm, through inability or malice, to efficiency and fairness. Jury deliberations are perhaps the most secret form of decision-making in the nation; the means of persuasion used by jurors on each other are never revealed. A single juror who failed to understand the import of the evidence being presented or who lacked any concern for the fairness of the outcome could severely obstruct or distort the course of justice. A single persuasive and unprincipled juror could even direct the course of justice into channels deliberately chosen for their deleterious effect on this country. We conclude, therefore, that the state has a compelling interest in the restriction of jury service to those who will be loyal to, interested in, and familiar with, the customs of this country.

Resident aliens by definition have not yet been admitted to citizenship. Until they become citizens, they remain in most cases legally bound to the country of their origin. Nothing is to prevent their return to that country, or a move to yet a third nation. It is true that many, if not most, aliens do intend to become citizens, and that their loyalty could probably be counted upon. However, it is the process of filing for citizenship that establishes that loyalty; any attempt at prior screening would undercut the efficiency and significance of existing procedures. Therefore, although the presumption that all aliens owe no allegiance to the United States is not valid in every case, no alternative to taking citizenship for testing allegiance can be devised, so that we conclude that the classification is compelled by circumstances, and that it is justifiable.

Service on juries is the prime example of an instance "where citizenship bears some rational relationship to the special demands of the particular position."[9] This has been explicitly recognized, by dictum if not by holding, in several Supreme Court cases which have dealt with juror qualifications under the Fourteenth Amendment.[10]

While this Court has lately ruled as to this same plaintiff that the Equal Protection Clause provides a shield against denial of his right to practice veterinary medicine on grounds of alienage, it now also rules that the Clause does not bar his disqualification on grounds of alienage from the unique responsibilities of jury service. Such service may appropriately be limited to citizen members of the political community.

In this case defendant Montgomery County has moved to be dropped as a party under Rule 21. The County contends that it has no control over the qualifications for jurors and their selection which are provided for by Public General Law of the State of Maryland codified in Article 51, Annotated Code of Maryland. Since the Clerk of the Circuit Court for Montgomery County, the

9. Concurring opinion of Judge Lumbard, Sugarman v. Dougall, 339 F.Supp. at 911.

10. Carter v. Jury Commission, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) ; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880) ; Jugiro v. Brush, 140 U.S. 291, 11 S.Ct. 770, 35 L.Ed. 510 (1891).

Jury Commissioner and the State of Maryland remain as parties, adequate relief to the plaintiff could be provided were this Court's determination reversed on appeal. Therefore, the Court will grant the motion of Montgomery County to be dropped as a party.

Accordingly, it is the 28th day of January, 1974,

Ordered:

(1) That the motion of defendants for summary judgment be, and the same hereby is, granted;

(2) That the motion of plaintiff for summary judgment be, and the same hereby is, denied;

(3) That the motion of defendant Montgomery County to be dropped as a party be, and the same hereby is, granted.

WINTER, Circuit Judge, concurs in the judgment of the Court for the reasons separately stated.

WINTER, Circuit Judge (concurring):

I readily concur in the judgment of the court and I agree with much of what is said in its opinion. The differences, if any there be, between my views and those of the majority, lie in the articulation of the precise basis on which the judgment rests. Because I would prefer to make sharper definitions than those made by the majority, I proceed to state my separate views:

Notwithstanding that *Sugarman* [1] and *Carter* [2] contain suggestions to the contrary, I agree with the majority that the outcome of this case should depend upon whether a compelling state interest justifies the requirement that the selection of jurors be confined to persons who are citizens, because alienage is a suspect classification. Defendants assert that resident aliens, as a class, lack three general characteristics that are prerequisites to minimally proficient jury service: (1) familiarity with language; (2) familiarity with the laws and customs of the jurisdiction served by the jury panel; and (3) commitment to the laws which it is the juror's obligation to apply. Because it may reasonably be assumed, so the argument runs, that individual members of the class will lack one or more of these characteristics, the government (federal and state) has a compelling interest in excluding all of the members of the class from jury service. I will examine these various characteristics and the reasonable necessity for exclusion of jurors on the grounds of each, seriatim.

With regard to the first two asserted characteristics, certainly native born citizens *as a class* are more likely to be familiar with our language, customs and laws than resident aliens *as a class.* [3] The only basis for the assertion that

1. In Sugarman v. Dougall, 413 U.S. 634, 648, 92 S.Ct. 2842, 37 L.Ed.2d 853 (1973), Mr. Justice Blackmun, writing for the court, stated that while state action in regard to voter qualifications is not immune from scrutiny under the equal protection clause, that scrutiny will not be "so demanding" where the state action is within the state's constitutional prerogatives. Examples given were the state's right to require citizenship as a prerequisite to holding public office and to voting. The analogy to jury service is manifest.

2. In Carter v. Jury Commission, 396 U.S. 320, 332, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), there is the flat statement that the states may "confine the selection [of jurors] to citizens." The statement, however, is only dictum.

3. There are of course, exceptions in each category. There is a clearly definable minority of native born citizens who speak, write and understand only a language other than English. The United States is sufficiently large and diverse that regional differences in the usage and meaning of some aspects of English exist. Similarly, there are regional differences in the mores affecting interpersonal relationships. These differences become operative as the mobility of citizens within the United States increases. Many aliens, and undoubtedly plaintiff is one, speak and understand a purer form of English than many Americans, and undoubtedly many aliens adhere to political and personal mores not dissimilar to those possessed by American citizens. I believe, however, that these are the exceptions rather than the rule.

naturalized citizens have a greater familiarity with such subjects than resident aliens is the fact that successful completion of the naturalization process requires that the naturalized citizen pass certain examinations designed to demonstrate that he has an adequate familiarity with such subjects. Defendants contend that they are entitled to rely upon the tests administered by the Bureau of Immigration and Naturalization to separate the class of persons who are not citizens by birth into those who are qualified for effective jury service (those who have been naturalized) and those who are not (those who have not yet been naturalized). I do not think that such reliance survives close judicial scrutiny. There is obviously a less drastic means of ensuring that a prospective resident alien juror is sufficiently proficient in English and sufficiently familiar with our laws and customs to serve effectively. Albeit, with some administrative inconvenience and burden, defendants could condition the eligibility of resident aliens for jury service upon their successful completion of examinations comparable to those administered by the Bureau of Immigration and Naturalization. By that means a resident alien could establish that he has sufficient knowledge to serve effectively as a juror, without being required to abandon the legal relationship he enjoys with his present sovereign. It should be noted, however, that any examination, whether for naturalization or solely to establish jury eligibility, could only demonstrate *knowledge* of American language, customs and laws; it could not measure sympathy with or willingness to be governed by American customs and laws or to apply them. Were this not a case of a suspect classification requiring close judicial scrutiny, I would be persuaded that the administrative convenience of relying upon the naturalization process would justify imposing this additional burden on the class discriminat-

ed against. However, since defendants *could* create an examination system which would ensure that resident aliens applying for jury service possess adequate familiarity with our language, customs and laws,[4] I would rest the judgment upon adoption of the third justification relied upon by the defendants.

Defendants contend that effective jurors should have, in addition to minimal knowledge of language, laws and customs, a commitment to uphold the laws of the United States and the several states, both by observance and application. I agree. The desirability of such a commitment is particularly compelling in the case of grand jurors who are charged with the responsibility of determining whether the prosecution of alleged violations of the criminal law shall go forward. A grand juror who cares little whether the laws of the United States are vindicated could undermine substantially the government's effort to obtain even-handed enforcement of the criminal laws. As the majority points out, it is no less desirable that petit jurors have a commitment to uphold the laws of the United States and the several states. Although petit juries are instructed as to their obligation to apply the law, it cannot be denied that, at least in criminal cases, petit juries have an unreviewable power to nullify the law by acquitting a criminal defendant against whom a case has been clearly proved. In both civil and criminal cases the unassailability of a jury's resolution of disputed questions of fact is well established, and this is an additional reason why those facts should be resolved in accordance with the mores of the community in which the case arose. The state and federal governments thus have a substantial interest in ensuring that the power exercised by grand and petit jurors is entrusted to persons who can be expected to have a substantial commitment to the just enforcement of

---

4. There has been no insuperable administrative problem in identifying and excluding from jury service those persons, otherwise eligible, who lack a sufficient knowledge of English or who are so deficient in cognitive skills and understanding as to render them inefficient jurors.

the law in accordance with the mores and fabric of American life.

Although resident aliens are liable for federal and state taxation and, in general, benefit from the protection of our civil and criminal laws, their continued allegiance to a foreign sovereign may cast substantial doubt upon their inclination to apply the laws of this country in the spirit and with the enthusiasm that the government and litigants have a right to expect. The relationship of a citizen of the United States, either native born or naturalized, to this country, when compared to that of an alien to the government of the territory in which he resides, contains several elements likely to lead the citizen to feel a stronger commitment to the enforcement of the laws of the United States. Some of these were identified by Mr. Justice Rehnquist, writing in dissent in *Sugarman*, 413 U.S. at 661–662, 93 S.Ct. at 2867:

> Native-born citizens can be expected to be familiar with the social and political institutions of our society; with the society and political mores that affect how we react and interact with other citizens. Naturalized citizens have also demonstrated their willingness to adjust to our patterns of living and attitudes, and have demonstrated a basic understanding of our institutions, system of government, history, and traditions. It is not irrational to assume that aliens as a class are not familiar with how we as individuals treat others and how we expect "government" to treat us. An alien who grew up in a country in which political mores do not reject bribery or self-dealing to the same extent that our culture does; in which an imperious bureaucracy historically adopted a complacent or contemptuous attitude toward those it was supposed to serve; in which fewer if any checks existed on administrative abuses; in which "low-level" civil servants serve at the will of their superiors—could rationally be thought not to be able to deal with the public and with citizen civil servants with the same rapport

that one familiar with our political and social mores would, or to approach his duties with the attitude that such positions exist for service, not personal sinecures of either the civil servant or his or her superior.

Citizens, as a rule, harbor positive feelings toward their sovereign and possess a sense of identity with their fellow citizens. I think it not unreasonable to believe that resident aliens may be likely to permit their positive feelings toward their foreign sovereigns and their sense of identity to their fellow-countrymen to impair their commitment to the enforcement and application of American law in those situations where our law resolves a question of public policy in a manner different from the law of the alien's sovereign, or where American law defining interpersonal relationships differs from the law of the alien's sovereign. Unlike the governments of many other nations, American government, national, state and local, is a participatory democracy. United States citizens, both native born and naturalized, are entitled to participate in the formulation of the laws of the United States and the several states through exercise of the franchise and eligibility for public office. To me, it is not unreasonable to expect that jurors who have, at least theoretically, some influence upon the content of the laws they must apply and enforce will have a greater commitment to their proper application and enforcement than those lacking such influence.

Of course, some resident aliens could be so individually constituted that their continued commitment to a foreign sovereign would not stand in the way of enthusiastic commitment to the proper enforcement and application of the laws of the United States and the several states; but this is an unidentifiable group. Unlike *knowledge* of a language, law or custom, personal commitment is not susceptible of objective measurement. Even if knowledge is established, an oath to serve as a juror in accordance with such knowledge is virtually unenforceable. An actual demonstration of personal commitment is necessary, and I

can conceive of no other form of demonstrated commitment short of naturalization, where an alien formally renounces allegiance to his previous sovereign and freely and willingly assumes allegiance to the United States, that is likely to serve the state and federal government's interest in ensuring that jurors have the proper attitude toward the enforcement of our laws.

In short, I conclude that the state and federal governments have a substantial interest in restricting eligibility for jury service to persons likely to have a personal commitment to the proper application and enforcement of the laws of the United States and the several states. The determination that resident aliens are so likely to retain ties to their fatherland that may undermine such a commitment has a sufficient basis in fact to survive the "close scrutiny" test. Therefore, I agree that the exclusion of resident aliens from service on grand and petit juries is justified by a "compelling" interest in ensuring that persons who serve as jurors are personally committed to the proper application and enforcement of the laws of the United States and the several states.