COMMONWEALTH *vs*. RICARDO ACEN, JR.
COMMONWEALTH *vs*. ALBERTO PENABRIEL.

Suffolk. October 8, 1985. — January 6, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Jury and Jurors. Alien. Practice, Criminal*, Jury and jurors. *Constitutional Law*, Equal protection of laws, Jury.

Article 12 of the Massachusetts Declaration of Rights, entitling criminal defendants to "judgment of [their] peers, or [by] the law of the land," did not afford defendants the right to a trial by jury "de medietate linguae," and therefore, the requirements of G. L. c. 234A, § 4, that jurors speak and understand English and that a jury be composed wholly of citizens of the United States, were not unconstitutional under art. 12. [473-477]

Defendants could not prevail on their claim under art. 12 of the Massachusetts Declaration of Rights that as members of a group of individuals who cannot speak English and who are noncitizens they were entitled to a jury selection process free of discrimination against their grouping in the community, where they were unable to base their claim of discrimination on membership in any class referred to in art. 1 of the Massachusetts Declaration of Rights. [477-478]

The requirements of G. L. c. 234A, § 4, that jurors speak and understand English do not deny a criminal defendant his right under the Sixth and Fourteenth Amendments to the United States Constitution to a petit jury selected from a fair cross section of the community. [478-480]

The requirement of G. L. c. 234A, § 4, that a jury be composed wholly of citizens of the United States does not violate either the Sixth Amendment or the equal protection provision of the Fourteenth Amendment to the United States Constitution. [480-482]

On an appeal from criminal convictions, there was no basis for the defendant's contention that an official notice of juror qualification requirements, which had stated that noncitizens and non-English speaking persons were excluded from service as jurors, had prejudiced the jury pool against potential defendants belonging to the excluded groups, thereby depriving them of the "fundamental fairness" guaranteed by the due process clause of the Fourteenth Amendment to the United States Constitution. [482-483]

INDICTMENTS found and returned in the Superior Court Department on March 14, 1984.

A motion to dismiss was heard by *James P. Donohue*, J., and the cases were tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

INDICTMENT found and returned in the Superior Court Department on April 6, 1984.

A motion to dismiss was heard by *Andrew G. Meyer*, J., and the case was tried before him.

The Supreme Judicial Court granted a request for direct appellate review.

*Fred Hewitt Smith* (*Cynthia Smith* with him) for the defendants.

*Judy G. Zeprun*, Assistant District Attorney, for the Commonwealth.

LYNCH, J. These appeals challenge the requirements of G. L. c. 234A, § 4 (1984 ed.), that jurors speak and understand English and that a jury be composed wholly of citizens of the United States. The defendants also challenge the notice to prospective jurors on the ground that that notice deprived the defendants of their right to a fair trial.[1]

The defendants' motions to dismiss raising these issues were denied.[2] The defendant Acen was tried and convicted on two indictments charging distribution of cocaine, and the defendant Penabriel was tried and convicted of attempted robbery (unarmed). The appeals were consolidated for purposes of briefing and oral argument in the Appeals Court. We granted Penabriel's application for direct appellate review and transferred the Acen case to this court on our own motion. We affirm the judgments of conviction.

1. *Trial by jury de medietate linguae*. Article 12 of the Massachusetts Declaration of Rights entitles the defendants to "judgment of [their] peers, or [by] the law of the land." The

---

[1] The notice of juror qualification requirements is reproduced as an appendix.

[2] These motions did not invoke art. 1 of the Declaration of Rights of the Massachusetts Constitution. Since the issues regarding art. 1 were raised for the first time on appeal, we do not address them.

defendants argue that art. 12 affords them the right to a trial by jury de medietate linguae[3] and therefore that the statutory requirements of citizenship and command of English are unconstitutional.[4]

Article 12 is directly drawn from Magna Charta, c. 39, which reads[5] that "no freeman shall be taken or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed or exiled, or other wise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers, or by the law of the land." *Whitcomb's Case,* 120 Mass. 118, 120 (1876) (Gray, C.J.). See *Jones* v. *Robbins,* 8 Gray 329, 342-343 (1857). To say that art. 12 is derived from Magna Charta, however, is not to say that our Constitution incorporates the precise rights and privileges imposed upon King John by the nobles at Runnymede. Were that the case, judgment by one's peers would be an impossible attainment in our more egalitarian society, since the term "peer" at the time of Magna Charta did not refer to all Englishmen.[6] Rather

---

[3] The phrase "de medietate linguae" means literally "of the half tongue." Black's Law Dictionary 387 (5th ed. 1979). A de medietate linguae jury were composed of six of an alien's own countrymen and six English citizens or denizens (a category of people who, although alien born, had obtained letters patent to make them English subjects but were not naturalized by act of parliament) which was allowed where one party was an alien. *Id.* at 387, 391.

[4] Neither defendant sought a trial by jury de medietate linguae.

[5] Of course, the original written text is in Latin: "Nullus liber homo capiatur, vel imprisonetur, aut disseisiatur, aut utlagetur, aut exuletur, aut aliquo modo destruatur, nec super eum ibimus, nec super eum mittemus, nisi per legale judicium parium suorum vel per legem terre." See W. McKechnie, Magna Carta, A Commentary of the Great Charter of King John 436 (1905).

[6] The Latin word "parium" in Magna Charta, c. 39, see note 5, *supra,* derives from the word "pares" which translates in normal usage as "equal." The defendants argue that "parium" should be given its ordinary, everyday meaning obviously invoking the plain meaning doctrine. See, e.g., *Commonwealth* v. *Colon-Cruz,* 393 Mass. 150, 167 (1984). Such an approach, however, oversimplifies the history of Magna Charta, which was directed "to the reform of a specific and clearly defined group of abuses." McKechnie, *supra* at 437. Whereas the notion of a judgment of one's peers was recognized prior to Magna Charta, and was a right shared by all grades of free-

we look at the words of art. 12 not "as a newly invented phrase, first used by the makers of our constitution; but we are to look at it as the adoption of one of the great securities of private right, handed down to us among the liberties and privileges which our ancestors enjoyed at the time of their emigration, and claimed to hold and retain as their birthright." *Jones* v. *Robbins, supra* at 342. Thus from Magna Charta did we receive the great fundamental principles of due process and trial by jury. See *Rochin* v. *California*, 342 U.S. 165, 168-172 (1952); *Davidson* v. *New Orleans*, 96 U.S. 97, 101-102 (1877); *Thompson* v. *Utah*, 170 U.S. 343, 347-348 (1898); *Jones* v. *Robbins, supra* at 342-343. Whatever else may be said of a jury de medietate linguae, its relative obscurity alone demonstrates it is not among those great fundamental principles. It is also clear that this form of trial was not derived from Magna Charta.

"The jury *de medietate linguae*, anciently allowed in England for the trial of an alien, was expressly authorized by statute . . . ." *Ex parte Virginia*, 100 U.S. 339, 369 (1879) (Field, J., dissenting). Justice Field referred, implicitly, to 28 Edw. III, c. 13 (1354) which provided the privilege of a trial by jury de medietate linguae to all aliens.[7] It is clear, however, that although 1353 is considered the traditional date of the inception of such a privilege, its lineage is considerably older.[8] The

holders, the abuses that the barons at Runnymede sought to redress were abuses of their rights as crown tenants and under-tenants to judgments by men of their respective ranks. *Id.* at 438-439. King John had deprived the barons of this right in many cases by the use of tribunals consisting entirely of Crown nominees who were "ready to give any sentence which John might dictate." *Id.* at 439. Thus, the term "peers" referred to only a specific group of Englishmen.

[7] That statute broadened the privilege granted in 1353 to alien merchants, 27 Edw. III, st. 2, c. 8, to all aliens. See LaRue, A Jury of One's Peers, 33 Wash. & Lee L. Rev. 841, 850 (1976). Cf. note 8, *infra*.

[8] As early as 1201, King John granted special consideration to Jews of England in a "Charter of Liberties" which provided, in part, "if a Christian shall have a cause of action against a Jew, let him be tried by the Jew's peers." LaRue, *supra* at 849. See McKechnie, *supra* at 269, 439-440. Although that grant predated the rise of juries in criminal trials, see J.H. Baker, An Introduction to English Legal History 64 (1979), there is evidence of such a jury in a criminal trial in 1278. See LaRue, *supra* at 849.

practice endured throughout some 500 years until finally re-
pealed by 33 Vict. c. 14 (1870).[9] The statutory right to trial
by jury de medietate linguae was therefore an infrequently
used part of the common law of England, around the time of
the formation of this Commonwealth. See *Respublica* v.
*Mesca*, 1 U.S. (1 Dall.) 73 (Pa. 1783); *State* v. *Antonio*, 11
N.C. 200 (1825); *People* v. *McLean*, 2 Johns. 381 (N.Y. Sup.
Ct. 1807) (citing English trials by jury de medietate linguae).

    Some early cases from other American jurisdictions recog-
nized the right although no case since *United States* v. *Wood*,
299 U.S. 123, 145 (1936) (which held in dictum that the
"ancient rule" of trial by jury de medietate linguae "no longer
obtains" under the Sixth Amendment), has acknowledged its
existence. See *Respublica* v. *Mesca, supra; People* v. *McLean,
supra; United States* v. *Cartacho*, 25 F. Cas. 312 (C.C.D.
Va. 1823) (No. 14,738); *United States* v. *Carnot*, 25 F. Cas.
297 (C.C.D.C. 1824) (No. 14,726). See also LaRue, A Jury
of One's Peers, 33 Wash. & Lee L. Rev. 841, 850 & n.29
(1976). Cf. 3 W. Blackstone, Commentaries *360-361. Even
where the right has been found to exist, some jurisdictions
have limited its applicability. See *State* v. *Antonio, supra.* Cf.
*Richards* v. *Commonwealth*, 38 Va. (11 Leigh) 690 (1841)
(use of trial by jury de medietate linguae held discretionary).
See also *Respublica* v. *Mesca, supra* at 75.[10] No modern court
has found the right to be of constitutional magnitude, and we
decline to do so here. Even if we assume that the right was
adopted as part of the common law of Massachusetts[11] (Part

---

    [9] During the reign of Henry V, a general statute was passed which specified
juror qualifications. Though that statute made no mention of the right to
trial by jury de medietate linguae, the courts decided that 28 Edw. III,
c. 13, had been repealed. LaRue, *supra* at 859. 8 Hen. VI, c. 29, reaffirmed
that statute. See *State* v. *Antonio*, 11 N.C. 200, 204 (1825).

    [10] Chief Justice McKean applied 28 Edw. III as he felt "bound" by "neces-
sity" to do so. *Respublica* v. *Mesca*, 1 U.S. (1 Dall.) *supra* at 75. But he
wrote, "if this were a new case the judgment of the court would be different;
for, the reasons which gave rise to the 28 Edw. 3. do not apply to the
present government, nor to the general circumstances of the country." *Id.*

    [11] We are aware of no reported Massachusetts decision which indicates
that a trial by jury de medietate linguae was granted, or even considered

II, c. 6, art. 6, of the Massachusetts Constitution) and has not fallen into desuetude[12] or lapsed for lack of applicability to current conditions, the Legislature could preempt and abrogate the common law rule by G. L. c. 234A, § 4.[13]

2. *Claims under art. 12.* In the alternative, the defendants rely on our decision in *Commonwealth* v. *Aponte,* 391 Mass. 494, 507 (1984), for the proposition that a "defendant is constitutionally entitled to a jury selection process free of discrimination against his grouping in the community." See *Commonwealth* v. *Soares,* 377 Mass. 461, 478, cert. denied, 444 U.S. 881 (1979), quoting *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 92 (1973). In order to prevail in such a claim a defendant must demonstrate that he is a member of a "protected class." *Commonwealth* v. *Aponte, supra* at 506-508. See *Commonwealth* v. *Soares, supra* at 486 ("particular, defined groupings in the community"). See also *Commonwealth* v. *Bastarache,* 382 Mass. 86, 101 (1980). The defendants assert that individ-

---

in any case. It is clear that even at an early point in Massachusetts history — during the colonial and provincial periods — there were laws extant which limited juries strictly to freeholders or freemen and inhabitants. Colony Laws c. 61, § 1 (1634); Province Laws c. 5, § 9 (1692); Province Laws c. 61, § 5 (1699). Ancient Charters 144-145, 221, 332 (1814). Cf. *State* v. *Antonio, supra* at 214-215 (Taylor, C.J., dissenting) (freehold qualification for jurors, standard at common law, does not abrogate the right to trial by jury de medietate linguae).

However, Colony Laws c. 98, § 4 (1641), entitled, "Acts Respecting Trials" provided: "Also children, idiots, distracted persons, and all that are strangers or new comers to our plantation, shall have such allowances, and dispensations in any case, whether criminal or others, as religion and reason require." Ancient Charters 199 (1814). There is no reason to believe, however, that that provision was intended to cover a situation like a trial by jury de medietate linguae. The development of strangers' courts is also unrelated. See Menand, A "magistracy fit and necessary": A Guide to the Massachusetts Court System, Law in Colonial Massachusetts, 1630-1800, 541-549 (1984).

[12] See J.C. Gray, The Nature and Sources of the Law 197, 329-334 (1921).

[13] "Unless there is a violation of a constitutional guaranty, the Legislature may modify or abrogate common law practices under Part II, c. 6, art. 6, of the Massachusetts Constitution." *New Bedford Standard-Times Publishing Co.* v. *Clerk of the Third Dist. Court of Bristol,* 377 Mass. 404, 410 (1979). See *Commonwealth* v. *Jackson,* 369 Mass. 904, 920-923 (1976); *Pinnick* v. *Cleary,* 360 Mass. 1, 11-12 (1971); 4 Op. Att'y Gen. 309 (1914).

uals who cannot speak English and noncitizens form discrete groups within the community deserving of art. 12 protection.

In *Commonwealth* v. *Aponte, supra* at 507, we stated that "[t]he groups which art. 12 protects and which cannot form the basis for juror exclusion are the same classes referred to in art. 1 of the Massachusetts Declaration of Rights." See *Commonwealth* v. *Bastarache, supra* at 101; *Commonwealth* v. *Soares, supra* at 486 n.29, 488-489.[14] The defendants do not base their claim of discrimination on membership in any such class. Their art. 12 discrimination claims therefore cannot prevail.

3. *The Federal law claims.* In *Taylor* v. *Louisiana*, 419 U.S. 522, 526-531, 538 (1975), and *Duren* v. *Missouri*, 439 U.S. 357, 359 (1979), the United States Supreme Court held that a criminal defendant has the right, under the Sixth and Fourteenth Amendments to the United States Constitution, to "a petit jury selected from a fair-cross-section of the community."[15] *Duren* v. *Missouri, supra* at 364, created a three-part test for establishing a prima facie violation of the fair cross section requirement of the Sixth Amendment: (1) the group must be a "distinctive" group in the community; (2) the venires must not fairly and reasonably represent the proportion of such persons in the community; and (3) such underrepresentation must result from systematic exclusion of the group when juries are selected. The showing of a prima facie violation of the fair-cross-section requirement does not end the inquiry: the State may rebut the prima facie case, if "a significant state interest" is "manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Duren* v. *Missouri, supra*

---

[14] Article 1 states in pertinent part: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

[15] Under *Taylor* and *Duren*, a criminal defendant need not be a member of the excluded class to challenge an exclusion. *Taylor* v. *Louisiana, supra* at 526. *Duren* v. *Missouri, supra* at 359 n.1.

at 367-368.[16] The defendants' challenges fail under *Duren* and *Taylor*.

a. *The non-English speaking requirement*. In acknowledging the existence of the fair-cross-section requirement, the Court pointed out in *Taylor, supra* at 538, that the States retain "broad discretion" and "remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions." Cf. *Commonwealth* v. *Brown*, 121 Mass. 69, 78 (1876). It is unquestionable that an ability to speak English is a relevant and important qualification for jurors. No court has ever held that "non-English speaking persons" form a distinct or protected class. Cf. *United States* v. *Valentine*, 288 F. Supp. 957, 962-966 (D.P.R. 1968). In fact, the weight of authority is to the contrary. In *United States* v. *Armsbury*, 408 F. Supp. 1130, 1135 (D. Or. 1976), the court held that under the Sixth Amendment and the Jury Selection and Service Act of 1968 (28 U.S.C. §§ 1861 et seq.): "Groups based solely on language, residency, or citizenship are not cognizable." The earlier case of *United States* v. *Mirabal Carrion*, 140 F. Supp. 226, 230-231 (D.P.R. 1956), likewise found no exclusion of a "cohesive or representative group" under a Federal grand jury requirement, 48 U.S.C. § 867 (1982), which excluded non-English speaking persons from the grand jury list.

In *Commonwealth* v. *Olivo*, 369 Mass. 62, 72 (1975), we held that those who are unable to read English are not a suspect class under the equal protection clause. That reasoning applies to the Sixth Amendment as well.[17] It remains true that "a group might constitute a 'distinctive' group in the community for Sixth Amendment purposes but not [be] an 'identifiable' group for equal protection purposes" because of the broader scope

---

[16] The *Duren* Court noted that heightened scrutiny — not mere rational scrutiny — was in order. *Id.* at 367, quoting *Taylor* v. *Louisiana, supra* at 534. The analysis for purposes of equal protection differs somewhat. See *Duren* v. *Missouri, supra* at 368 n.26. See 481-482, *infra*.

[17] Since it is settled that non-English speaking persons are not a suspect class, the defendants' equal protection claims must be judged under the rational basis test. See *Commonwealth* v. *Olivo*, 369 Mass. 62, 72 (1975).

of Sixth Amendment protections. See *Commonwealth* v. *Bas-tarache*, 382 Mass. 86, 97 (1980). But under both the equal protection clause and the Sixth Amendment, the policy favoring an exclusion of non-English speaking persons is the same. "English is the language of this country. This conception is fundamental in the administration of all public affairs." *Con-ners* v. *Lowell*, 209 Mass. 111, 119 (1911). See *Commonwealth* v. *Olivo, supra* at 72-73.

Even if we assumed, arguendo, that non-English speaking persons were a "distinct" class, there would be no doubt that a significant interest would be "manifestly and primarily" advanced by such an exclusion.[18] The courts that have considered the problem have found that the requirement that conduct of judicial affairs be in English is both reasonable and important. See *United States* v. *Benmuhar*, 658 F.2d 14, 19-20 (1st Cir. 1981); *Miranda* v. *United States*, 255 F.2d 9, 16-17 (1st Cir. 1958); *United States* v. *Mirabal Carrion, supra.* As the United States District Court for the District of Puerto Rico announced in *United States* v. *Valentine, supra* at 964, "it is difficult to conceive how this court could remain a viable part of the federal judicial system if proceedings here were conducted in Spanish." "In any other district court, the contention would be too patently frivolous to require an answer." *Id.* at 962. As we noted in *Olivo, supra* at 73, "[t]his is not an officially multilingual country," and we take notice of the fact that English is and has been the primary language of the Commonwealth since its inception.

b. *Noncitizenship.* In *Carter* v. *Jury Comm'n of Greene County*, 396 U.S. 320, 332 (1970), the Supreme Court stated in dictum that "States remain free to confine the selection [of jurors] to citizens." The courts that have considered that issue have been in accord. *United States* v. *Gordon-Nikkar*, 518 F.2d 972, 976-977 (5th Cir. 1975). *United States* v. *Armsbury, supra* at 1135. *Perkins* v. *Smith*, 370 F. Supp. 134, 138

---

[18] It follows that the standard of scrutiny required in the case for equal protection purposes is also met. See *Duren* v. *Missouri, supra* at 367-368.

(D. Md. 1974), aff'd, 426 U.S. 917 (1976). *Rubio* v. *Superior Court*, 24 Cal. 3d 93, 101 (1979). We agree, and find G. L. c. 234A withstands the constitutional challenges raised here under both the Sixth Amendment and the equal protection clause.

For purposes of the equal protection clause it is settled that most classifications based on alienage are inherently suspect and subject to close judicial scrutiny.[19] *Bernal* v. *Fainter*, 467 U.S. 216, 219-220 & n.5 (1984). *In re Griffiths*, 413 U.S. 717, 721 (1973). *Sugarman* v. *Dougall*, 413 U.S. 634, 642 (1973). *Graham* v. *Richardson*, 403 U.S. 365, 372 (1971). However, an exception to that rule exists for "political function[s]." *Bernal* v. *Fainter, supra* at 220. See *Foley* v. *Connelie*, 435 U.S. 291, 297 (1978); *Ambach* v. *Norwick*, 441 U.S. 68, 78-79 (1979); *Cabell* v. *Chavez-Salido*, 454 U.S. 432, 439-441 (1982). Laws which "exclude aliens from positions intimately related to the process of democratic self-government," are not subject to strict scrutiny. *Bernal* v. *Fainter, supra* at 220.

Although the exception is "narrow," *Bernal* v. *Fainter, supra*, the Court has found police officers, public school teachers, and probation officers to be so related. *Id.* at 220. *Foley* v. *Connelie, supra. Ambach* v. *Norwick, supra. Cabell* v. *Chavez-Salido, supra.* In *Foley, supra* at 296, the Court stated in dictum that a State may deny aliens the right to vote or to run for office "for these lie at the heart of our political institutions . . . [and] [s]imilar considerations support a legislative determination to exclude aliens from jury service." Jury service clearly lies at the heart of Anglo-Saxon democratic self-government and falls within the *Bernal* political function exception. See *Perkins* v. *Smith, supra* at 138.

Even though minimum scrutiny is all that is required in this case, G. L. c. 234A could withstand even the heightened scrutiny imposed by the fair-cross-section requirement of the

---

[19] Some courts have held that, for Sixth Amendment purposes, alienage is not a distinct or protected class. See *United States* v. *Armsbury, supra* at 1135. We assume, without deciding, that alienage is a distinct or protected class. Cf. *United States* v. *Gordon-Nikkar, supra* at 975-977.

Sixth and Fourteenth Amendments. Both *Perkins* and *Gordon-Nikkar* upheld similar statutes under strict scrutiny analysis. That rationale is at once compelling and obvious: jury service demands loyalty to this country and its laws as well as knowledge of and familiarity with its customs. *United States* v. *Gordon-Nikkar, supra. Perkins* v. *Smith, supra.* See *United States* v. *Armsbury, supra* at 1134. Resident aliens often have allegiance to this Commonwealth and the country, and could be competent to sit on juries. See *Perkins, supra* at 138. Yet it is undeniable that some aliens do not possess these requisite attributes and jury service is too critical to the just operation of the court system to place it in the hands of those who are not able to carry out the duties of such service. The naturalization process requires citizens to demonstrate loyalty and competence for the duties of citizenship generally, and any other test of loyalty and competence would either be ineffective or would "undercut the efficiency and significance of existing procedures." *Id.*

4. *The notice of juror qualification requirements.* The defendants claim prejudice in the mailing of the juror qualification notice. On this issue they do not rely on the equal protection clause or the fair-cross-section requirement, but instead assert a denial of "fundamental fairness."[20]

The basis of the defendants' claim is their assertion that the notice prejudices the jury pool by suggesting that noncitizens and non-English speaking persons are "unqualified" to be jurors in some pejorative sense, which thereby prejudices defendants who are in those groups. The notice does juxtapose various disqualifications which might carry such overtones, e.g., minority, previous criminality, or insanity. But the notion that such a notice to potential jurors would so prejudice them against those classes which are excluded from service as to deprive them of a fair trial is unfounded. Jurors presumably will under-

---

[20] Although it is unclear on what constitutional principle the defendants rely, we assume that they invoke the "fundamental fairness" requirement of the due process clause. See *Lassiter* v. *Department of Social Servs.*, 452 U.S. 18, 24-25 (1981). See also *Pinkerton* v. *Farr*, 159 W. Va. 223, 229-230 (1975).

stand that minors or individuals over age seventy, for example, are not to be judged in their trials by virtue of their affiliation with their groups. While it might be helpful if the notice pointed out that groups disqualified for jury service are not unequal before the law in other respects, it was not error to omit such a provision.

The motions to dismiss were denied correctly.

*Judgments affirmed.*

APPENDIX.

NOTICE OF JUROR QUALIFICATION REQUIREMENTS
(Mass. General Laws, Chapter 234A)

Any resident of a county, or any inhabitant living in a county for more than 50% of the time, whether or not a registered voter, shall be qualified to serve as a grand or trial juror in the county unless:
1. Such person is not a citizen of the United States.
2. Such person is 70 years of age or older and chooses not to perform juror service.
3. Such person is under the age of 18 years.
4. Such person is not able to speak and understand the English language.
5. Such person has permanently moved from the county.
6. Such person lives outside of the county and does not intend to return at any time during the following year.
7. Such person has been convicted of a felony in the past 7 years, or is a defendant in any pending felony case, or is the custody of any correctional institute.
8. Such person has served as a grand or trial juror in any state or federal court within the current year or previous 3 calendar years, or the person is currently scheduled to perform juror service. *A person has "served" if he has duly appeared in court able and willing to perform juror service whether or not he was placed on a trial.* ·
9. Such person is incapable, by reason of a physical or mental disability, of rendering satisfactory juror service. Any person claiming this disqualification must submit a letter from a registered physician or accredited Christian Science practitioner stating the nature of the disability, and the physician or practitioner's opinion that such disability prevents the person from rendering satisfactory juror service. *"In reaching such opinion, the physician shall apply the following guideline: a person shall be capable of rendering satisfactory juror service if such person is able to perform a sedentary job requiring close attention for six hours per*

*day, with short work breaks in the morning and afternoon sessions, for three consecutive business days."*

10.  Such person is solely responsible for the daily care of a permanently disabled person living in the same household, and the performance of juror service would cause a substantial risk of injury to the health of the disabled person. Any person claiming this disqualification must submit a letter from a registered physician stating the name, address, and age of the disabled person, the nature of the daily care provided by the prospective juror, and the physician's opinion that the performance of juror service would cause a substantial risk of injury to the health of the disabled person.