SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-09-0218-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) Nos. CR2004-006577-001 DT |
| BENJAMIN BERNAL COTA, | )     CR2004-005648-001 DT |
| | )        (CONSOLIDATED) |
| Appellant. | ) |
| | ) |
| | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Michael D. Jones, Judge

**CONVICTIONS AND DEATH SENTENCE AFFIRMED; REMANDED FOR
RESENTENCING ON NON-CAPITAL COUNTS**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Criminal Appeals/Capital Litigation Section
          Susanne Bartlett Blomo, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG, ESQ.                                  Fort Collins, CO
     By   David Goldberg
Attorney for Benjamin Cota

_____

**H U R W I T Z**, Vice Chief Justice

¶1      A jury found Benjamin Bernal Cota guilty of two counts of first degree murder, two counts of armed robbery, one count of possession of narcotics, and one count of unlawful flight. He was sentenced to death on one first degree murder count and to prison terms for the other counts. We have jurisdiction over

this appeal under Article VI, Section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and 13-4033(A)(1) (2011).[1]

## I. FACTS AND PROCEDURAL BACKGROUND[2]

¶2        Victor Martinez and his wife, Guadalupe Zavala, lived in Peoria.  In late 2003, they hired Cota to assist with home repair projects.  Martinez and Zavala had jobs outside their home and spoke with friends and family daily.  But on December 30, 2003, both disappeared without explanation.

¶3        Martinez was last seen that afternoon.  He told his son that he was going to take a nap, and then drive Cota home before going to work at 6:00 p.m.  Martinez never arrived at work.  Zavala worked until 8:00 p.m. that night, but was never heard from thereafter.  Concerned friends, co-workers, and family members called and went by the couple's home repeatedly in the following days.  Cota sometimes answered the telephone and gave inconsistent accounts about the couple's whereabouts. He also began driving the couple's pickup truck and gave their car to his son.  He sold the couple's water heater and tried to sell jewelry he claimed the couple had given him.

---

[1]    We cite the current version of statutes that have not materially changed since the events at issue.

[2]    "We view the facts in the light most favorable to upholding the verdicts." *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).

2

**¶4** On January 3, 2004, Cota pawned two of Zavala's bracelets. He withdrew money from the couple's bank accounts on January 5 and 6. He invited friends to stay with him at the couple's home, but told them not to enter the master bedroom or answer the phones. After Cota allowed them to enter the master bedroom, one friend saw a large pile of clothes in the closet.

**¶5** On January 6, family members went to the home and noticed items missing outside, including the water heater. They called the police and gained entrance into the home. They found the bodies of Martinez and Zavala wrapped in plastic in the master bedroom closet beneath a pile of clothes.

**¶6** Police located Cota at his mother's home, where the couple's pickup truck was parked. During an ensuing chase, Cota tossed items out of the truck, including drugs and his wallet. Police apprehended him after he crashed the truck and fled on foot. His wallet contained Zavala's date of birth and social security number, and pawn tickets dated January 3. Police searched Cota's mother's home and found his shoes. DNA testing of blood on the shoes revealed contributions from Cota, Martinez, and Zavala.

**¶7** Cota was charged in one indictment with two counts of first degree murder and two counts of armed robbery, and in a second with possession of narcotics and unlawful flight. The indictments were joined for trial, and a jury found Cota guilty

on all counts. In the aggravation phase of the murder cases, the jury found that Cota had been convicted of a serious offense committed on the same occasion, A.R.S. § 13-751(F)(2), that Cota committed the crime while on authorized release, § 13-751(F)(7), and that Martinez was over the age of seventy, § 13-751(F)(9).

¶8 In the penalty phase, the jury returned a death sentence for the murder of Zavala, but was unable to reach a verdict as to the murder of Martinez. The trial court sentenced Cota to natural life on that count and to prison terms for the non-homicide counts, all but one consecutive to the others.

## II. ISSUES ON APPEAL

### A. Consolidation of Cases and Flight Evidence

¶9 Cota argues that the trial court erred by admitting evidence of his flight from the police and by joining the two indictments for trial. Cota, however, twice consented to the joinder. He first did so months before trial and again early in the trial when the judge entered a formal consolidation order.

¶10 Before joining the indictments, the trial court had granted the State's motion to admit evidence of Cota's flight in the murder case. When the indictments were formally consolidated, defense counsel preserved an objection to the flight evidence, but said that in light of the court's previous adverse ruling on that issue, Cota had decided to consent to the joinder for strategic reasons. Thus, the only relevant question

4

is whether the flight evidence was properly admitted.  We review for abuse of discretion.  *State v. Bible*, 175 Ariz. 549, 592, 858 P.2d 1152, 1195 (1993).

¶11     Evidence of flight is admissible to show consciousness of guilt when the defendant flees "in a manner which obviously invites suspicion or announces guilt."  *State v. Weible*, 142 Ariz. 113, 116, 688 P.2d 1005, 1008 (1984).  Cota does not dispute this general principle, but argues that the eight days between the murders and his flight rendered the evidence inadmissible.  Remoteness of flight in relation to the commission of the crime, however, goes to the weight of the evidence, not its admissibility.  *Bible*, 175 Ariz. at 592, 858 P.2d at 1195; *see also State v. Edwards*, 136 Ariz. 177, 184, 665 P.2d 59, 66 (1983) (holding flight evidence properly admitted when defendant fled from police fifteen months after the crime was committed).

¶12     Cota also contends that the flight evidence was inadmissible because he may have been fleeing because he had violated parole and had drugs in the car.  But "[m]erely because a defendant is wanted on another charge . . . does not make evidence of flight per se inadmissible."  *Bible*, 175 Ariz. at 592, 858 P.2d at 1195.  The circumstances here "justify an inference that Defendant was fleeing from some other, more serious crime."  *Id.*  The trial court did not abuse its

5

discretion by admitting the flight evidence and instructing the jury as to its limited use with respect to the murder counts.[3]

**B. Exclusion of Non-English Speaking Jurors**

**¶13**      A.R.S. § 21-202(B)(3) requires dismissal of prospective jurors "not currently capable of understanding the English language."  Cota moved to preclude the jury commissioner from excluding non-English speakers from the master jury list.  Citing *State v. Cordova*, 109 Ariz. 439, 511 P.2d 621 (1973), the trial court denied the motion.  Cota argues that § 21-202(B)(3) is unconstitutional.  We review a statute's constitutionality de novo.  *State v. Stummer*, 219 Ariz 137, 141 ¶ 7, 194 P.3d 1043, 1047 (2008).

**¶14**      "[T]he American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975).  A defendant alleging a fair cross-section violation of the Sixth Amendment must show

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is

---

[3]    Contrary to Cota's argument, Arizona Rule of Evidence 404(b) did not prohibit the admission of evidence of Cota's flight, because the evidence was not used "to prove the character of a person in order to show action in conformity therewith."  Ariz. R. Evid. 404(b).

> due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). The Constitution is not violated, however, if "a significant state interest" is "manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

¶15 Cota contends that "non-English speaking Hispanic citizens" are a "distinctive group." Section 21-202(B)(3), however, excuses *all* prospective jurors "not currently capable of understanding the English language," not just Hispanics. "Non-English speakers" are not a "distinctive group" for Sixth Amendment purposes. *See, e.g.*, *State v. Haugen*, 243 P.3d 31, 39-40 (Or. 2010); *Commonwealth v. Acen*, 487 N.E.2d 189, 194 (Mass. 1986).

¶16 Moreover, the statute serves a significant state interest. In rejecting a similar challenge, we noted that "[i]t would be an undue burden upon the State court system to have to translate for non-English speaking or reading jurors." *Cordova*, 109 Ariz. at 441, 511 P.2d at 623. This state interest remains compelling.[4] *See State v. Gibbs*, 758 A.2d 327, 341 (Conn. 2000).[5]

---

[4] Cota contends that *Cordova* is no longer valid in light of *Ruiz v. Hull*, 191 Ariz. 441, 957 P.2d 984 (1998), which concerned Article 28 of the Arizona Constitution, the "English

7

## C. Dismissal of Juror 46

¶17    Given Cota's drug addiction and widespread drug use among his friends and family, testimony at the guilt and penalty phases focused on substance abuse. Questions regarding addiction were therefore included in the juror questionnaire.

¶18    Juror 46 disclosed that two of her brothers had died of heroin overdoses. When the prosecutor asked if she could set aside her experiences and consider the evidence fairly, she responded, "Honestly, no. It's upsetting me right now thinking about it." When the trial judge asked if she could be fair to both sides, Juror 46 said she didn't know if she could be fair to the prosecution. The judge excused her for cause.

¶19    Cota argues that the trial judge erred by excusing Juror 46 and by not allowing Cota sufficient opportunity to

---

as the Official Language" amendment. But *Ruiz* was not based on a classification of non-English speakers as a "distinctive" class. Rather, the Court held that the amendment violated the First and Fourteenth Amendments insofar as it "impinge[d] upon both the fundamental right to participate equally in the political process and the right to petition the government for redress." *Id.* at 459, 957 P.2d at 1002. Neither concern is at issue here.

[5]    Cota also argues that his right to a jury selected in a non-discriminatory manner was violated. The defendant's burden in establishing a prima facie violation of this Fourteenth Amendment right is virtually identical to the burden in establishing a Sixth Amendment fair cross-section claim. *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977). Cota's Fourteenth Amendment claim fails for the same reasons as his Sixth Amendment claim.

8

rehabilitate her.  We review for abuse of discretion.  *State v. Lavers*, 168 Ariz. 376, 390, 814 P.2d 333, 347 (1991).

**¶20**      A juror should be excused for cause "[w]hen there is reasonable ground to believe that a juror cannot render a fair and impartial verdict."  Ariz R. Crim. P. 18.4(b).  The record supports the trial court's dismissal of this juror.  The record also demonstrates that, before the trial judge excused Juror 46, defense counsel had a fair opportunity to examine her.  *See State v. Cañez*, 202 Ariz. 133, 148 ¶ 37, 42 P.3d 564, 579 (2002) ("The method and scope of voir dire is left to the discretion of the trial judge.").[6]

### D. Admissibility of Interrogation

**¶21**      Police arrested Cota on January 6, 2004, at about 5:30 p.m.  Cota later told police that he had used drugs in the hour before being arrested.  Peoria Detectives Laing and Hickman began interrogating Cota at approximately 9:20 p.m.   After approximately two hours, Cota invoked his right to counsel and the interrogation ended.  During the interrogation, Cota appeared to fall asleep a few times.

---

[6]    Cota also argues that excusing Juror 46 violates the rule of *Witherspoon v. Illinois*, 391 U.S. 510 (1968).   Under that case, a juror may not be removed for cause for mere misgivings or general objections to the propriety of the death penalty, but rather only if "irrevocably committed" to vote against death. *Id*. at 520-23, 522 n.21.   Juror 46's removal, however, had nothing to do with her views on the death penalty.

¶22     Cota contends that the trial court erred by admitting his videotaped interrogation because (1) his statements were involuntary as a result of drug intoxication, and (2) he invoked his right to remain silent two times before the police finally acknowledged the invocation of his right to counsel.  In the superior court, however, Cota objected to the introduction of the interrogation only on voluntariness grounds.  We review the trial court's voluntariness finding for abuse of discretion. *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). We review the *Miranda* claim only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶¶ 19-20, 115 P.3d 601, 607 (2005).

### 1. Intoxication

¶23     The trial court found Cota's statements voluntary after an evidentiary hearing.  We uphold factual findings as to the "voluntary nature of a confession if the findings are supported by adequate evidence in the record." *State v. Rhymes*, 129 Ariz. 56, 57-58, 628 P.2d 939, 940-41 (1981).

¶24     Statements are not automatically inadmissible if given under the influence of drugs or alcohol.  *Clabourne*, 142 Ariz. at 342, 690 P.2d at 61.  But, if the defendant is so intoxicated "that he could not understand the meaning of his statements, then the statements were involuntary." *State v. Tucker*, 157 Ariz. 433, 446, 759 P.2d 579, 592 (1988).  "We look[] to the

10

totality of the circumstances to determine whether the accused was able to reason, comprehend, or resist." *Id.*

¶25    Our review of the videotape of the interrogation confirms that Cota fully comprehended the questions posed and gave appropriate answers.  The record supports the trial court's finding that his statements were voluntary.

### 2. *Miranda* Issue

¶26    After being advised of his rights, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966).  Invocation of the right to remain silent need not be made with precision.  *See, e.g.*, *United States v. Ramirez*, 79 F.3d 298, 304 (2d Cir. 1996) ("A suspect need not rely on talismanic phrases or any special combination of words to invoke his Fifth Amendment right to remain silent.").  However, the invocation must be unambiguous, *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010), judged from the perspective of a "reasonable police officer in the circumstances," *Davis v. United States*, 512 U.S. 452, 459 (1994).

¶27    Cota cites two alleged invocations of the right to remain silent during the interrogation.  We examine each in turn.

11

### i. The Page 24 Statement

¶28        The first alleged invocation occurs at page 24 of the interrogation transcript (the "Page 24 Statement"), after the detectives had repeatedly told Cota (apparently inaccurately) that they had discovered blood on his clothing:

> **Laing**: That's why we are asking you.  The blood's on your clothing.  I don't see any big injuries on you to get that kind of blood.
>
> **Cota**: There ain't no blood on my shirt.
>
> **Laing**: Yes there is.
>
> **Cota**: I'm not saying nothing no more[;] you guys are fucking with me.

¶29        This statement was not an unambiguous invocation of the right to remain silent.  A reasonable officer could have construed Cota's comments as meaning that he knew the officers were lying about blood on his shirt and that he no longer wished to talk about this subject.  *See State v. Lawson*, 144 Ariz. 547, 554-55, 698 P.2d 1266, 1273-74 (1985) (finding that statement, "I've got nothing to say," made in response to the question – "You got anything to say to that?" - could fairly be read as a refusal to talk about that specific question and not a general invocation of the right to remain silent).

### ii. The Page 40 Statement

¶30        The second alleged invocation occurs at page 40 (the "Page 40 Statement"):

12

**Laing:** Hey Benjamin we're not lying to you man. We've got your clothes and they've got blood on them. You've got some explaining to do because you're going to be in a lot of shit of [sic] that blood comes back and it belongs to Victor. You're gonna have a lot of explaining to do. If things just went crazy you need to let us know. But I've been doing this job too long Benjamin. Don't . . . don't sit there and play . . . play me to be the fool, I know when you're lying to me, you're not telling the truth now. What happened?

**Cota**: I'm sorry, what was your name?

**Laing**: Detective Laing . . . Bill Laing.

**Cota**: Laing I ain't saying nothing no more.

¶31     The Page 40 Statement was an unambiguous invocation of the right to remain silent, and questioning should have ceased at this point. In contrast to the Page 24 Statement, Cota was responding not to a specific question about blood on his clothing, but to a very general question: "What happened?" Cota's answer was unequivocal, and more calm and thoughtful than the Page 24 Statement, as evidenced by his demeanor, tone of voice, and the additional step of asking the detective his name.

¶32     The Page 40 Statement is indistinguishable from those we have previously found to be unambiguous invocations of the right to remain silent. In *State v. Finehout*, for example, we rejected the argument that the following exchange was ambiguous:

**JONES**: You might as well be honest with us, cause you know–

**DEFENDANT**: I'm trying to be honest.

13

**JONES**: No you're not 'cause everytime we ask you something—

**DEFENDANT**: Well, I ain't going to say any more.

136 Ariz. 226, 227-29, 665 P.2d 570, 571-73 (1983); *see also State v. Castaneda*, 150 Ariz. 382, 386, 724 P.2d 1, 5 (1986) ("I have nothing to say" invoked right to remain silent.); *State v. Szpyrka*, 220 Ariz. 59, 61-62 ¶ 5, 202 P.3d 524, 526-27 (App. 2008) ("I ain't got nothin' to say" invoked Fifth Amendment rights.); *Strayhand*, 184 Ariz. at 585, 911 P.2d at 591 ("'Well I don't want [to] answer anymore,' could not have been clearer" invocation of Fifth Amendment rights.).

### iii. Fundamental Error Analysis

¶33    To warrant reversal, however, Cota must show fundamental error. Fundamental error goes to the foundation of the case, takes away a right essential to the defense, and is so severe that the defendant could not have received a fair trial. *Henderson*, 210 Ariz. at 567 ¶¶ 19-20, 115 P.3d at 607. No fundamental error occurred here in admission of the interrogation after page 40 because the continued questioning did not prejudice Cota at any phase of the trial.

¶34    Cota did not admit to the murders, either before or after page 40. Rather, he continued to maintain his innocence even after invoking his right to remain silent. Thus, the only prejudice Cota could have suffered from admission of statements

14

after page 40 was from a lack of credibility in his protestations of innocence. However, virtually all of Cota's statements after page 40 mirrored others made earlier in the interrogation.

¶35    The one significant exception is Cota's claim after page 40 that Martinez came back to the house at some point, stating that Zavala was "dead in his heart." But other evidence on this point was properly admitted at trial. Cota's drug dealer testified that Cota had told her that the couple had gone on vacation to Mexico, but that Martinez had returned and said Zavala was "dead in his heart."

### E. Psychological Testing

¶36    After Cota gave notice of his intent to present mental health experts in the penalty phase, the State moved for an examination by its expert, which was to include the MMPI-II personality inventory, or, alternatively, to preclude Cota's experts. Cota did not object to the examination, but objected to testing because his experts had done none. The trial court overruled the objection; we review for abuse of discretion. *State v. Newell*, 212 Ariz. 389, 404-05 ¶ 78, 132 P.3d 833, 848-49 (2006).

¶37    A defendant offering expert mental health testimony must either submit to a state examination or forego introducing his evidence. *State v. Schackart*, 175 Ariz. 494, 500-01, 858

15

P.2d 639, 645-46 (1993); *Phillips v. Araneta*, 208 Ariz. 280, 283 ¶ 9, 93 P.3d 480, 483 (2004) (applying *Schackart* to the penalty phase of a capital trial). The State's examination need not mirror that of the defense. Rather, the State is entitled to "a meaningful opportunity to rebut the defendant's expert testimony." *Phillips*, 208 Ariz. at 283 ¶ 9, 93 P.3d at 483. Here, the State's expert testified that mental health experts commonly use the MMPI, which contains a validity scale potentially helpful in evaluating the diagnoses made by Cota's experts. The judge did not abuse his discretion by ordering Cota to submit to the MMPI. *See Perkins v. State*, 808 So. 2d 1041, 1128 (Ala. Crim. App. 1999) (concluding that use of MMPI did not violate Fifth Amendment rights of defendant who put mental health at issue), *vacated on other grounds by Perkins v. Alabama*, 536 U.S. 953 (2002).

**F. Various Juror Issues**

¶38 Cota contends that the trial court erred by dismissing Juror 2 and designating Jurors 5, 9, and 13 as alternates. He also claims that the court erred by allowing Juror 10 to deliberate in the penalty phase after not deliberating in the guilt and aggravation phases.[7]

---

[7] As the State points out, Cota's argument regarding Juror 10 seemingly also applies to Juror 9, who deliberated in the penalty phase after serving as an alternate in the first two

16

### 1. Juror 2

¶39      On the second day of trial, a witness testified that he had known Martinez for fifty years. The prosecutor later incorrectly called the period "half a decade." After Juror 2 submitted a clarifying question, the matter was clarified. Later that day, the prosecutor stressed the term "half a century." Juror 2 took offense and reported to the bailiff that she was "humiliated," had missed several minutes of testimony because she was upset, and wasn't sure she could ever side with the State thereafter. Questioning by the court confirmed that she was upset. The next day, the State moved to strike Juror 2. The trial court granted the State's motion over Cota's objection, citing the juror's statements to the bailiff, her claim to be "offended," and the fact that she missed testimony.

¶40      A trial court's findings regarding a juror's ability to be fair and impartial and its dismissal of a juror are reviewed for abuse of discretion. *State v. Garcia*, 224 Ariz. 1, 16 ¶ 66, 226 P.3d 370, 385 (2010); *State v. Trostle*, 191 Ariz. 4, 12, 951 P.2d 869, 877 (1997). The trial court should excuse a juror "[w]hen there is reasonable ground to believe that a juror cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.4(b). The "reasonable ground" may arise during

---

phases. Cota, however, does not raise a similar argument as to Juror 9.

trial.  *Trostle*, 191 Ariz. at 13, 951 P.2d at 878.  The record here supports the trial judge's decision.

### 2. Juror 10

¶41     Cota argues that the trial court erred by allowing Juror 10 to deliberate in the penalty phase after serving as an alternate in the previous two phases.  But we have repeatedly rejected the argument that the same jurors must serve in all phases of a capital trial.  *See State v. Prince*, 226 Ariz. 516, 527-28 ¶¶ 21-25, 250 P.3d 1145, 1156-57 (2011); *Garcia*, 224 Ariz. at 17 ¶ 71, 226 P.3d at 386.

¶42     Cota argues that these cases are distinguishable because the trial court here did not voir dire Juror 10 to see if she accepted the previous verdicts.  But this is not required; the juror must simply be aware of her role in the penalty phase.  *Garcia*, 224 Ariz. at 17 ¶¶ 70-71, 226 P.3d at 386.  Although it may be advisable for the trial court to discuss this role with the juror individually, such discussion is not necessary where the entire jury is instructed properly, as it was here.  *Id.*

### 3. Jurors 5, 9, and 13

¶43     During selection, jurors were told when the trial was scheduled to end.  Unfortunately, the trial did not proceed as promptly as envisioned.  Juror 9 had already made vacation plans for the week in which guilt phase deliberations finally were to

18

begin. Jurors 5 and 13 both had already paid for tickets to leave town when the penalty phase began. On each occasion, the trial judge designated the jurors as alternates instead of releasing them or continuing the trial.

¶44 Alternates are supposed to be selected by lot by the clerk. Ariz. R. Crim. P. 18.5(h). However, designation of alternates by the trial judge does not require reversal in the absence of resulting prejudice. *State v. Blackhoop*, 162 Ariz. 121, 122, 781 P.2d 599, 600 (1989); *State v. Martinez*, 198 Ariz. 5, 9 ¶¶ 15-19, 6 P.3d 310, 314 (App. 2000). Cota has not shown that he was deprived of a fair and impartial jury at any stage of the trial, and therefore cannot demonstrate prejudice. *Blackhoop*, 162 Ariz. at 122, 781 P.2d at 600.

### G. Admission of Autopsy Photographs

¶45 The trial court admitted autopsy photographs over Cota's objection. The photographs depict both victims in the condition the medical examiner received them and during the autopsies. The trial court admitted three photographs only in black and white to minimize any "gruesome effect." We review for abuse of discretion. *State v. Lynch*, 225 Ariz. 27, 37-38 ¶ 51, 234 P.3d 595, 605-06 (2010).

¶46 Whether the trial court abused its discretion in admitting a photograph turns on (1) the photograph's relevance, (2) its tendency to inflame the jury, and (3) its probative

19

value compared to its potential to cause unfair prejudice. *State v. Anderson ("Anderson II")*, 210 Ariz. 327, 339 ¶ 39, 111 P.3d 369, 381 (2005). Photographs must not be introduced "for the sole purpose of inflaming the jury," *State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982), but "[t]here is nothing sanitary about murder" and sometimes gruesome photographs properly will be introduced, *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997).

¶47    "[T]he fact and cause of death are always relevant in a murder prosecution." *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). The photographs here also helped to corroborate the State's theory on the timing of the two deaths. Admission of these exhibits was not an abuse of discretion.

## H. Discovery Sanctions against the State

¶48    Cota contends that the trial court erred by denying his motion for mistrial and imposing insufficient sanctions for discovery violations by the State. We review for abuse of discretion. *State v. Kuhs*, 223 Ariz. 376, 380 ¶ 18, 224 P.3d 192, 196 (2010).

### 1. Relevant Facts

¶49    Shannin Guy of the DPS crime lab performed DNA testing. Her report and notes were disclosed before trial and included the hand-written acronym "EDNA" in three locations. After Guy left DPS, the State could not initially locate her, so

20

it notified Cota on March 12, 2009, that it would call Scott Milne, another DPS analyst, who would conduct new testing.

¶50 Jury selection began on April 2. Milne's report was completed on April 3 and a copy provided to defense counsel the next day. Milne was unable to retest some items consumed by Guy's testing. However, using a relatively new method, Milne tested items on which previous tests were inconclusive, including Cota's tennis shoe. The State made additional disclosure concerning Milne's report and notes on April 24. His notes also included one notation of "EDNA."

¶51 On the eve of trial, the State located Guy. The State notified Cota that it intended to call both witnesses and on April 30 defense counsel interviewed Milne and Guy.

¶52 On May 11, Cota claimed that the State did not provide him with all of Milne's electronic data. The trial court found no bad faith, but ordered the State to disclose the data. The State provided Cota with electronic data that afternoon.

¶53 Guy testified on May 14 and May 18. She opined that the sample from Cota's shoe contained DNA from Cota and other "unknown" contributors. Milne later testified that he had identified both victims' DNA in the sample.

¶54 On May 19, Cota filed a motion asking the State to produce Guy's electronic data and "the laboratory's corrective actions log and extraneous DNA [EDNA] log." The trial court

21

granted the motion. On June 1, Cota still had not received Guy's electronic data. The court ordered that it be turned over for use in cross-examining Milne. The trial court also ordered Milne to provide additional data.

¶55 The EDNA log had been disclosed on May 21, and contained a list of all contaminated samples. DPS procedure was not to disclose the EDNA log unless it was specifically requested. On June 8, Cota filed a motion to dismiss for *Brady* violations. *See Brady v. Maryland*, 373 U.S. 83 (1963). Cota argued that the EDNA log was clearly exculpatory and that he could not have been expected to know what "EDNA" meant when it was handwritten on the reports and no other explanation was given.

¶56 The court found that DPS improperly withheld the EDNA log and certain electronic data. The court found, however, that any prejudice to Cota could be cured without a mistrial or preclusion of all DNA evidence. Neither Guy nor Milne had testified about any sample in the EDNA log. The court allowed Cota to re-call Guy for additional cross-examination, re-interview Milne before his testimony, interview another person at the lab, and tour the lab. The court also granted a continuance until June 22 to allow Cota's experts to review the materials.

22

¶57　　　　On June 22, Cota filed another motion to dismiss, alleging that some of Guy's electronic data was still missing. The trial court found that some data was missing because it had been improperly backed up. It also found that some of Guy's files were either destroyed or not retrievable. The court struck Guy's testimony and instructed the jury not to consider it.

¶58　　　　The court, however, denied Cota's request to preclude Milne's testimony. After Cota argued that striking Guy's testimony deprived him of the ability to demonstrate deficiencies in the DPS lab, the court allowed Cota to re-call her. Cota cross-examined Milne at length but did not re-call Guy. At Cota's request, the court instructed the jury that DPS had a duty to disclose all relevant information to the defense and ordered the State not to argue that the EDNA log need not have been disclosed.

## 2. The trial court's sanctions

¶59　　　　Cota argues that a mistrial should have been granted or, at the least, Milne's testimony precluded. But preclusion is required only when no less stringent sanction will suffice. *State v. Fisher*, 141 Ariz. 227, 246, 686 P.2d 750, 769 (1984). We apply a four factor test to determine whether preclusion is appropriate: (1) "how vital the precluded witness is to the proponent's case," (2) "whether the opposing party will be

23

surprised and prejudiced by the witness' testimony," (3) "whether the discovery violation was motivated by bad faith or willfulness," and (4) "any other relevant circumstances." *State v. Smith*, 123 Ariz. 243, 252, 599 P.2d 199, 208 (1979).

¶60 The trial court appropriately considered these factors. It found Milne's testimony "extremely relevant and important to the State's case" and that there was no bad faith. It also found that any prejudice to Cota could be cured by additional disclosure, interviews, and continuances. Cota had access to all relevant information before cross-examining Milne and identifies no area in which the cross-examination would have materially differed had he been granted more time.

¶61 Cota argues that a new trial is "ordinarily" the remedy for a *Brady* violation. But many *Brady* violations are discovered after trial, when no other remedy could suffice. Here, the trial court had other options and did not abuse its discretion by using them. The sanctions imposed sufficiently protected Cota's due process rights. *Cf*. *State v. Jessen*, 130 Ariz. 1, 4, 633 P.2d 410, 413 (1981) (finding no reversible error when previously undisclosed exculpatory information is revealed at trial and presented to the jury).

## I. Denial of Motion for Judgment of Acquittal

¶62 Cota moved under Rule 20 for judgment of acquittal on the armed robbery and felony murder charges. Cota argues that

24

the trial judge erred in denying these motions, contending that the evidence was insufficient to support the conviction for armed robbery and that the felony murder charge, for which armed robbery was the predicate felony, must also therefore fail.

**¶63**    We review denial of a Rule 20 motion de novo, viewing the evidence in the light most favorable to upholding the ruling. *State v. West*, 226 Ariz. 559, 562 ¶ 15, 250 P.3d 1188, 1191 (2011). Acquittal is required "if there is no substantial evidence to warrant a conviction." Ariz. R. Crim. P. 20(a).

**¶64**    Cota argues that the State presented no evidence to establish the necessary concurrence of intent to take the victims' property and use of force against the victims. *See State v. Murray*, 184 Ariz. 9, 31, 906 P.2d 542, 564 (1995). Use of force may precede the taking of property, but the State must prove the coexistence of the intent and the use of force in order to establish armed robbery. *Id.*

**¶65**    This is not, however, a case in which the evidence could only be reasonably interpreted as showing that the intent to steal was formed after the murders. *See State v. Wallace*, 151 Ariz. 362, 366, 728 P.2d 232, 236 (1986). Instead, as in *State v. Comer*, substantial evidence was introduced that

25

"[a]ppellant's financial condition provided the motive for [the] killing." 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990).[8]

### J. Failure to Give Manslaughter Instruction

¶66        Cota argues that the trial court erred in refusing a lesser-included offense instruction on manslaughter. But the jury was instructed on second degree murder, which it rejected. By rejecting that lesser-included offense, it "necessarily rejected all other lesser-included offenses." *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985). Moreover, Cota was convicted of both premeditated and felony murder, and manslaughter is not a lesser-included offense of felony murder. *State v. Schad*, 163 Ariz. 411, 417, 788 P.2d 1162, 1168 (1989).

### K. Victim Impact Statement

¶67        Cota contends that A.R.S. § 13-752(R), which authorizes victim impact statements in capital cases, is unconstitutional. We have, however, previously found § 13-752(R) constitutional. *State v. Dann*, 220 Ariz. 351, 369-70 ¶ 101, 207 P.3d 604, 622-23 (2009); *Lynn v. Reinstein*, 205 Ariz. 186, 190-91 ¶¶ 13-17, 68 P.3d 412, 416-17 (2003). Cota presents no compelling reason for us to abandon those holdings.

---

[8]    In any event, the first degree murder convictions were premised on two theories, felony murder and premeditated murder. Because the jury expressly found both felony and premeditated murder on each count, the murder convictions would stand even if the felony murder verdict were improper. *See Anderson II*, 210 Ariz. at 343 ¶ 59, 111 P.3d at 385.

26

¶68     In the alternative, Cota argues that the impact statement from Martinez's daughter was so inflammatory that the trial judge should have granted a mistrial. We review for abuse of discretion. *State v. Gallardo*, 225 Ariz. 560, 567 ¶ 26, 242 P.3d 159, 166 (2010).

¶69     Martinez's daughter characterized the bodies as "mutilated" and "tortured." She said that Cota could still "share pictures and visitation from his family," but she could no longer share anything with her father and Zavala. During her statement, at least four members of the jury cried. The court denied Cota's motion for mistrial and offered a curative instruction, which Cota declined.

¶70     A mistrial is required when victim impact testimony is so "unduly prejudicial that it renders the trial fundamentally unfair." *State v. Tucker*, 215 Ariz. 298, 320 ¶ 92, 160 P.3d 177, 199 (2007). The trial is not unfair simply because jurors were emotional during the statement. *Gallardo*, 225 Ariz. at 567 ¶ 29, 242 P.3d at 166.

¶71     The trial judge did not abuse his discretion in denying a mistrial. The judge correctly noted that the use of the word "mutilated" was supported by the evidence. While finding "tortured" more problematic, the court noted that Ms. Martinez used the word as a lay person and that her use of the word was not "out of line" given her observation of the two

27

bodies.  Finally, the judge noted that Ms. Martinez's comparison of her situation to Cota's was accurate and the jurors already had that obvious information before the statement.  The judge properly rejected the argument that the statement was an implicit sentencing recommendation.

¶72     We have upheld death sentences in cases involving similar victim impact testimony, *see, e.g.*, *State v. Prince*, 226 Ariz. 516, 534-36 ¶¶ 65-76, 250 P.3d 1145, 1163-65 (2011), and find no reversible error here.  The jurors were properly instructed not to be swayed by passion, prejudice, or sympathy, and that the statements could not be used as aggravation, but only as rebuttal to mitigation.  *See Dann*, 220 Ariz. at 369-70 ¶¶ 100-101, 207 P.3d at 622-23.  The trial judge offered to give a further specific limiting instruction, which Cota declined.

## L. Trial Court's Failure to Investigate Allegedly Sleeping Juror

¶73     During the penalty phase, defense counsel asked to voir dire Juror 12 because "several people" said that his eyes were closed during testimony.  The trial judge noted that he had watched Juror 12 closely after the allegations were brought to his attention.  Although he had seen Juror 12's eyes closed on occasion, the judge could tell Juror 12 was not asleep because he was tapping his foot and moving his wrist.  The judge denied the request for voir dire and Cota's subsequent motion for a new

28

trial.  This ruling is reviewed for abuse of discretion.  *State v. Hall*, 204 Ariz. 442, 447 ¶ 16, 65 P.3d 90, 95 (2003).

**¶74**       When a trial court becomes aware of possible juror misconduct, it should "conduct whatever investigation it deems warranted."  *State v. Cook*, 170 Ariz. 40, 55, 821 P.2d 731, 746 (1991).  Here, the judge chose personally to observe Juror 12 rather than conduct voir dire.  "'The conduct of the juror in open court was a matter of which the trial court had judicial knowledge and could take judicial notice.'"  *United States v. Curry*, 471 F.2d 419, 422 (5th Cir. 1973) (quoting *United States v. Carter*, 433 F.2d 874, 876 (10th Cir. 1970)); *see also Kuhs*, 223 Ariz. at 380 ¶ 18, 224 P.3d at 196 (allowing trial judges to rely on their observations of courtroom behavior in making decisions).  In light of his personal observations of Juror 12, the trial judge did not abuse his discretion in declining to excuse the juror or conduct further investigation.

### M. Failure to Instruct Jury that Arizona Law Precluded Cota From Being Considered for Parole

**¶75**       Cota argues that the trial court erred by instructing the jury that a life sentence might allow for release after twenty-five years, because he is not eligible for parole under A.R.S. § 41-1604.09(I).  This argument, however, conflates parole and release.  Cota would have been eligible for other

forms of release, such as executive clemency, if sentenced to life with the possibility of release.

¶76    The instruction given accurately stated the law. *State v. Hargrave*, 225 Ariz. 1, 15 ¶ 53, 234 P.3d 569, 583 (2010).  Cota's "argument that he is not likely to actually be released does not render the instruction legally incorrect." *Id.*

## N. Refusal to Instruct Jury on Presumption that Sentences Run Consecutively

¶77    Cota argues that the trial court erred by refusing to give his requested instruction that if sentenced to life, the two sentences for murder would presumptively run consecutively. We review de novo whether jury instructions "properly state the law."  *State v. Glassel*, 211 Ariz. 33, 53 ¶ 74, 116 P.3d 1193, 1213 (2005).

¶78    Sentences "run consecutively unless the court expressly directs otherwise."  A.R.S. § 13-711(A).  But this statute creates no presumption in favor of consecutive sentences.  *State v. Garza*, 192 Ariz. 171, 174 ¶ 10, 962 P.2d 898, 901 (1998).  Thus, Cota's proposed instruction was not an accurate statement of the law.

## O. Prosecutorial Misconduct in Closing Argument

¶79    Cota contends that the prosecutor improperly argued "uncharged or unproven aggravating circumstances" and commented

30

on his invocation of the right to remain silent. He did not object to the identified arguments at trial, so we review only for fundamental error. *State v. Bocharski*, 218 Ariz. 476, 491-92 ¶ 74, 189 P.3d 403, 418-19 (2008).

¶80 We find no reversible error. The prosecutor may argue the facts and reasonable inferences from the evidence at the penalty phase. *State v. Harrod*, 218 Ariz. 268, 278 ¶¶ 34-36, 183 P.3d 519, 529 (2008). The evidence supported her statements that Cota "laid in wait" and "viciously" killed Zavala because after killing Martinez, Cota apparently waited for Zavala to return from work. Substantial evidence also supported the characterization of Zavala's murder as vicious and the prosecutor's statement that Cota intended to "get rid" of her. None of these statements encouraged the jury to consider unproven aggravators.

¶81 Slightly more troubling is the statement that Cota committed the murders for money, because the aggravation phase jury was unable to reach a verdict on the F(5) aggravator. But the prosecutor did not argue in the penalty phase that the jury should consider pecuniary gain as an aggravator. The statement was in fair rebuttal of Cota's argument that the murders may have been committed in a methamphetamine-induced rage. Moreover, the judge instructed the jury that closing arguments were not evidence and explained the different functions of the

31

aggravation and penalty phases.  *See Prince*, 226 Ariz. at 538 ¶ 90, 250 P.3d at 1167.

**¶82**     Nor did the prosecutor improperly comment on Cota's right to remain silent.  The prosecutor's statements to which Cota objects were fair rebuttal to Cota's allocution.  Most of the statements at issue simply noted that Cota never expressed remorse for committing the crime during the allocution.  A defendant may claim remorse in allocution, but if he does so the State may rebut that statement.  *State v. Armstrong*, 218 Ariz. 451, 463 ¶¶ 54-59, 189 P.3d 378, 390 (2008).

**¶83**     The prosecutor also said that if Cota "were truly sorry and remorseful, wouldn't he have told the police how sorry he was?  On that 107 minutes of video, what do you see?  Angry, combative man.  He is not admitting."  This argument can fairly be read, however, as contrasting Cota's denials of responsibility in the interrogation with his subsequent claim of remorse.  Such comments are permissible.  *Id.*

   **P. Non-Capital Sentences**

**¶84**     The trial judge sentenced Cota to natural life for Martinez's murder, twenty-eight years for each armed robbery count, twelve years for drug possession, and six years for unlawful flight.  The judge used Cota's prior felony convictions to both enhance and aggravate these sentences.  He also stated that he believed Arizona law "required" him to make the

32

sentences consecutive, and he did so on all but the flight count. Cota contends that these sentences were illegal and that the trial court misapplied Arizona sentencing law by stating that consecutive sentences were "required."

### 1. The use of Cota's prior felony convictions to both enhance and aggravate Cota's sentences

¶85 The legislature may authorize trial courts to use the same circumstance for both aggravation and enhancement of a sentence. *State v. Bly*, 127 Ariz. 370, 373, 621 P.2d 279, 282 (1980). "[T]he authorization must be explicit and the specific factor expressly identified." *State v. Alvarez*, 205 Ariz. 110, 113 ¶ 8, 67 P.3d 706, 709 (App. 2003). Use of a prior felony conviction for aggravation and enhancement is expressly authorized by A.R.S. §§ 13-701(D)(11) and 13-703.

### 2. The imposition of consecutive sentences

¶86 The trial judge stated that "consecutive sentence[s] are required by Arizona law pursuant to A.R.S. 13-708."[9] Subsection A of that statute reads:

> Except as otherwise provided by law, if multiple sentences of imprisonment are imposed on a person at the same time, the sentence or sentences imposed by the court shall run consecutively unless the court expressly directs otherwise, in which case the court shall set forth on the record the reason for its sentence.

---

[9] Section 13-708 was renumbered as § 13-711 in 2009. *See* 2008 Ariz. Sess. Laws, ch. 301, § 27 (2d Reg. Sess.). Section 13-711 is identical to former § 13-708.

33

¶87     That section does not require that sentences run consecutively and does "'not constrict to any degree the trial court's discretion to impose [concurrent] sentences for the defendant's crimes.'" *Garza*, 192 Ariz. at 174 ¶ 12, 962 P.2d at 901 (quoting *State v. Fillmore*, 187 Ariz. 174, 184, 927 P.2d 1303, 1313 (App. 1996)).  Rather, the statute "merely requires the judge to set forth reasons for imposing concurrent rather than consecutive sentences and creates a default designation of consecutive sentences when the judge fails to indicate whether the sentences are to run concurrently or consecutively." *Id.* at 175 ¶ 12, 962 P.2d at 902.

¶88     The trial court was thus mistaken if it thought that consecutive sentences were required.  *Garza* remanded for resentencing because "the judge wrongly felt himself confined by a non-existent presumption." *Id.* at 175 ¶ 14, 962 P.2d at 902. "[I]f the record is unclear whether the judge knew he had discretion to act otherwise, the case should be remanded for resentencing." *Id.* at 176 ¶ 17, 962 P.2d at 903.  Although the judge here imposed one concurrent sentence, we are not convinced that he was aware of his discretion to do the same with all other sentences.  We therefore remand for resentencing on the non-capital counts.

**Q. Issues Raised to Avoid Federal Preclusion**

¶89     To avoid preclusion, Cota raises twenty-eight issues that he states have been rejected in decisions by the Supreme Court of the United States or this Court.  These issues and the decisions Cota identifies as rejecting them are listed in the appendix to this opinion.

**R. Review of the Death Sentence**

¶90     Because the murder of Zavala occurred after August 1, 2002, we review the death sentence to "determine whether the trier of fact abused its discretion in finding aggravating circumstances and imposing a sentence of death."  A.R.S. § 13-756(A).  "A finding of aggravating circumstances or the imposition of a death sentence is not an abuse of discretion if 'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)).

### 1. Proper standard of review and constitutionality of A.R.S. § 13-756(A)

¶91     Cota argues that the abuse of discretion standard is "more deferential than . . . the standard ordinarily articulated and applied by this Court."  He argues that the proper standard was announced by this Court in *Chapple*, 135 Ariz. at 297 n.18, 660 P.2d at 1224 n.18.  We reject this contention; the standard

cited in *Delahanty* and *Morris* is now mandated by § 13-756(A), which was enacted after *Chapple*.

¶92    Cota also argues that the abuse of discretion standard is unconstitutional because the Supreme Court has mandated "meaningful" appellate review of death sentences. *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). But we have already determined that abuse of discretion review is constitutional. *State v. Martinez*, 218 Ariz. 421, 434 ¶¶ 61-62, 189 P.3d 348, 361 (2008). Meaningful appellate review requires only that an appellate court "consider whether the evidence is such that the sentencer could have arrived at the death sentence that was imposed," not whether the appellate court itself would have imposed a death sentence. *Clemons*, 494 U.S. at 749.

### 2. Aggravating Circumstances

¶93    The jury found that Cota had been convicted of another serious offense, A.R.S. § 13-751(F)(2), and committed the murder while on authorized release, A.R.S. § 13-751(F)(7)(a). Cota does not contest these findings, which are amply supported by the evidence.

### 3. Mitigating Circumstances

¶94    If an aggravating circumstance is established, the jury must determine whether death is the appropriate penalty in light of any mitigating circumstances proven by the defendant. A.R.S. § 13-751(C). Here, Cota presented evidence on a variety

36

of mitigating factors, including intoxication at the time of the murders, troubled family history, history of substance abuse, lack of previous violence, and low risk of future violence in prison. The State presented evidence to rebut many of these mitigating factors.

¶95     We overturn the jury's imposition of a death sentence only if no "reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220. Even if we assume that Cota proved each of his alleged mitigating factors, the jury still did not abuse its discretion here by finding the mitigation insufficient to warrant leniency.

### III. CONCLUSION

¶96     For the foregoing reasons, we affirm Cota's convictions and death sentence, but remand for resentencing on the non-capital counts.

_____
                Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice

_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice

**APPENDIX**

1. The death penalty is *per se* cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186-87 (1976); *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492 (2001).

2. Execution by lethal injection is *per se* cruel and unusual punishment. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

3. Arizona's death penalty statutory scheme is unconstitutional because it permits jurors unfettered discretion to impose death without adequate guidelines to weigh and consider appropriate factors and fails to provide principled means to distinguish between those who deserve to die or live. *State v. Johnson*, 212 Ariz. 425, 440, ¶ 69, 133 P.3d 735, 750 (2006).

4. The statute unconstitutionally fails to require the cumulative consideration of multiple mitigating factors or require that the jury make specific findings as to each mitigating factor. *State v. Gulbrandson*, 184 Ariz. 46, 69, 906 P.2d 579, 602 (1995).

5. Arizona's statutory scheme for considering mitigating evidence is unconstitutional because it limits full consideration of that evidence. *State v. Mata*, 125 Ariz. 233, 242, 609 P.2d 48, 57 (1980).

6. Arizona's death statute is unconstitutional because there are no statutory standards for weighing. *State v. Atwood*, 171 Ariz. 576, 645-46 n.21(4), 832 P.2d 593, 662-63 n.21(4) (1992).

7. The prosecutor's discretion to seek the death penalty unconstitutionally lacks standards. *State v. Cromwell*, 211 Ariz. 181, 192, ¶ 58, 119 P.3d 448, 459 (2005).

8. The Constitution requires a proportionality review of a defendant's death sentence. *State v. Gulbrandson*, 184 Ariz. 46, 73, 906 P.2d 579, 606 (1995).

9. Appellant's death sentence is in violation of his rights to a jury trial, notice and due process the Fifth, Sixth and Fourteenth Amendments since he was not indicted for a

capital crime. *McKaney v. Foreman*, 209 Ariz. 268, 271, ¶ 13, 100 P.3d 18, 21 (2004).

10. The reasonable doubt jury instruction lowered the state's burden of proof and deprived Appellant of his right to a jury trial and due process under the Sixth and Fourteenth Amendments. *State v. Dann (Dann I)*, 205 Ariz. 557, 575-76, ¶ 74, 74 P.3d 231 (2003).

11. Arizona's death statute creates an unconstitutional presumption of death and places an unconstitutional burden on Appellant to prove mitigation is "sufficiently substantial to call for leniency." *Walton v. Arizona*, 497 U.S. 639, 648 (1990); *State v. Glassel*, 211 Ariz. 33, 52, ¶72, 116 P.3d 1193, 1212 (2005).

12. The failure to provide the jury with a special verdict on Appellant's proffered mitigation deprived him of his rights to not be subject to ex post facto legislation and right to meaningful appellate review. *State v. Roseberry*, 210 Ariz. 360, 373, ¶ 74 & n.12, 111 P.3d 402 (2005).

13. Permitting the State to argue that Appellant's mitigation evidence should be given limited or no weight absent proof of a causal nexus to the murder(s) violates the Eighth and Fourteenth Amendments. *State v. Anderson (Anderson II)*, 210 Ariz. 327, 350, ¶¶ 93-97, 82, 111 P.3d 369 (2005).

14. Arizona's *current* protocols and procedures for execution by lethal injection constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Andriano*, 215 Ariz. 497, ¶¶ 61-62, 161 P.3d 540 (2007).

15. The jury instruction that required the jury to unanimously determine that the mitigating circumstances were "sufficiently substantial to call for leniency" violated the Eighth Amendment. *State v. Ellison*, 213 Ariz. 116, ¶¶ 101-102, 140 P.3d 899 (2006).

16. The failure to instruct the jury that only murders that are "above the norm" may qualify for the death penalty violates the Sixth, Eighth and Fourteenth Amendments. *State v. Bocharski (Bocharski II)*, 218 Ariz. 476, ¶¶ 47-50, 189 P.3d 403 (2008).

17. The State's introduction of hearsay rebuttal testimony violated Appellant's rights to confrontation and cross

examination under the Sixth Amendment. *State v. McGill*, 213 Ariz. 147, 158-59, 140 P.3d 930 (2006).

18. The refusal to permit voir dire of prospective jurors regarding their views on specific aggravating and mitigating circumstances violates Appellant's rights under the Sixth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 440, ¶¶ 29-35, 133 P.3d 735, 750 (2006).

19. The refusal to permit Appellant to argue or the jury to consider whether his death sentence would be proportional to other similarly situated defendants violated his rights under the Eighth and Fourteenth Amendments. *State v. Johnson*, 212 Ariz. 425, 431-32, ¶¶ 19-20, 133 P.3d 735, 750 (2006).

20. Refusing to instruct the jury or permit the introduction of evidence and argument regarding residual doubt violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments and Arizona law. *State v. Harrod (Harrod III)*, 218 Ariz. 268, ¶¶ 37-39, 183 P.3d 519 (2008); *State v. Garza*, 216 Ariz. 56, 70, ¶ 67, 163 P.3d 1006 (2007).

21. The refusal to permit evidence regarding a sentence of life without parole and ineligibility of any future release deprived Appellant of his rights under the Eighth and Fourteenth Amendments. *State v. Cruz*, 218 Ariz. 149, 154-55, ¶¶ 40-45, 181 P.3d 196 (2008).

22. Instructing the jury that Appellant might be eligible for release after 25 years violates the Fifth, Sixth, Eighth and Fourteenth Amendments. *State v. Hargrave*, 225 Ariz. 1, ¶¶ 50-53, 234 P.3d 569 (2010).

23. The failure to instruct the jury that the State bore the burden of proving its rebuttal to mitigation evidence beyond a reasonable doubt violated Appellant's rights under the Sixth, Eight and Fourteenth Amendments. *State v. Roque*, 213 Ariz. 193, 225-26, ¶¶ 138-140, 141 P.3d 368 (2006).

24. The penalty phase jury instructions that advised the jury they "must" return a death sentence in various circumstances and forms of verdict impermissibly shifted the burden of proof to the defendant and created a presumption of death. *State v. Tucker (Tucker II)*, 215 Ariz. 298, 317, 160 P.3d 197(2007).

25. Arizona's death penalty scheme violates Appellant's right to equal protection under the Fourteenth Amendment since it fails to require the jury to make specific findings of fact and conclusions of law reviewable on appeal. *State v. Dann (Dann III)*, 220 Ariz. 351, ¶¶ 127-28, 207 P.3d 604 (2009).

26. Arizona's death penalty scheme violates Appellant's rights under the Eighth and Fourteenth Amendments by not requiring that once a defendant proves mitigating circumstances exist that the State prove beyond a reasonable doubt that the mitigation is not sufficiently substantial to call for leniency and that death is the appropriate sentence. *State v. Dann (Dann III)*, 220 Ariz. 351, ¶¶ 94-95, 207 P.3d 604 (2009).

27. The death penalty is an irreversible denial of human rights and international law. *State v. Richmond*, 136 Ariz. 312, 322, 666 P.2d 57 (1983).

28. The use of Appellant's conviction that occurred contemporaneous with the murder as an aggravating circumstance under ARS § 13-751(F)(2) violates double jeopardy under the Fifth and Fourteenth Amendments. *State v. Pandeli (Pandeli III)*, 215 Ariz. 514, 523, ¶ 16, 161 P.3d 557 (2007).

42